J-S04004-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: S.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: R.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1683 EDA 2021 |

Appeal from the Order Entered July 22, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0003052-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: S.B.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: R.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1684 EDA 2021 |

Appeal from the Decree Entered July 22, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000489-2020

BEFORE:   BENDER, P.J.E., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:                    **FILED APRIL 4, 2022**

R.M. (Father) appeals from the decree and the order, both dated July 21, 2021, and entered on July 22, 2021, that granted the petitions filed by the Philadelphia Department of Human Services (DHS) to involuntarily terminate Father's parental rights and to change the permanency goal to

---

[*] Former Justice specially assigned to the Superior Court.

adoption for S.M. (Child),[1] born in November of 2017. After review, we affirm.[2]

In Father's brief, he sets forth the following issues for our review:

1.  Did the court below err in finding that [DHS] … had met its burden in proving grounds under 23 Pa.C.S.[] §§ 2511[(a)] (2), (5), and (8)?

2. Did the court below err in finding that DHS had met its burden to prove that termination would be in the [C]hild's best interests[] under § 2511(b)?

3. Did the court below err when it found that DHS by clear and convincing evidence had met its burden to change [C]hild's goal to adoption?

4. Did the court below err in failing to make a finding as to "reasonable efforts"?

Father's brief at 4.

We review an order terminating parental rights in accordance with the following standard:

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily

_____

[1] S.M. is also identified as S.B.M. The parental rights of Child's mother, A.M. (Mother), were involuntarily terminated at the same time as Father's rights. Mother's appeal is addressed in a separate decision. At the time of Mother's and Father's marriage, he became the step-father to Mother's older child, J.L.B.

[2] By order, issued on September 22, 2021, this Court *sua sponte* consolidated these appeals because they involve related parties and issues. *See* Pa.R.A.P. 512.

terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (quoting *In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005)). Moreover, we have explained that:

> The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (quoting *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)). The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa. Super. 2003).

Since Father's third issue concerns the trial court's decision to change the goal for Child to adoption, we address that issue by applying the following standard of review:

> In cases involving a court's order changing the placement goal … to adoption, our standard of review is abuse of discretion. *In re N.C.*, 909 A.2d 818, 822 (Pa. Super. 2006). To hold that the trial court abused its discretion, we must determine its judgment was "manifestly unreasonable," that the court disregarded the law, or that its action was "a result of partiality, prejudice, bias or ill will." *Id.* (quoting *In re G.P.-R.,* 851 A.2d 967, 973 (Pa. Super. 2004)). While this Court is bound by the facts determined in the trial court, we are not tied to the court's

inferences, deductions and conclusions; we have a "responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record." ***In re A.K.***, 906 A.2d 596, 599 (Pa. Super. 2006). Therefore, our scope of review is broad. ***Id.***

***In re S.B.***, 943 A.2d 973, 977 (Pa. Super. 2008).

Pursuant to the Juvenile Act, 42 Pa.C.S. § 6351(f), when considering a petition for goal change for a dependent child, the juvenile court is to consider, *inter alia*: (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the child; and (5) a likely date by which the goal for the child might be achieved. ***In re S.B.***, 943 A.2d at 977. The best interests of the child, and not the interests of the parent, must guide the trial court. ***Id***. at 978.

We have reviewed the certified record, the briefs of the parties, the applicable law, and the extensive and comprehensive opinion authored by the Honorable Allan L. Tereshko of the Court of Common Pleas of Philadelphia County, dated October 8, 2021. We determine that Judge Tereshko's well-reasoned decision disposes of the issues raised by Father. In particular, the trial court notes that "S.M.'s sibling, J.L.B., was the victim of repeated physical and emotional abuse while in Mother and Stepfather['s], R.M.[, ]care. Both Mother and R.M. were found by this [c]ourt to be the perpetrators of child abuse on March 14, 2018. This Child, S.M., … has been in foster care since

November [of] 2017, four days after her birth." Trial Court Opinion (TCO), 10/8/2021, at 35. Additionally, Judge Tereshko's opinion provides the following conclusion as to the termination of Father's parental rights and the goal change for S.M.:

> The evidence presented to this [c]ourt was clear and convincing that Father is incapable of providing the protection necessary to keep this Child safe, and that he is incapable of parenting. Safety and loving care [are] essential to the growth and well-being of any child, and this [c]ourt cannot place this Child in an environment where her well-being and safety may be at risk. This Child's life cannot be placed on hold in the hope that Father will summon the ability to handle the responsibilities of parenting. Further, this Child and her older sibling have been placed together in a loving, caring, nurturing home with the pre-adoptive foster family, and this [c]ourt believes they deserve the opportunity to experience a loving, caring home where they are protected from harm.

*Id.*

Having concluded that Judge Tereshko's opinion properly disposes of the issues Father has raised in these appeals, we adopt Judge Tereshko's opinion as our own and affirm the order and the decree on that basis.

Decree and order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/4/2022

**THE FIRST JUDICIAL DISTRICT OF PENNSYLVANIA, PHILADELPHIA COUNTY**
**IN THE COURT OF COMMON PLEAS**

| | |
|---|---|
| IN THE INTEREST OF: | : FAMILY COURT DIVISION |
| | : JUVENILE BRANCH-Dependency |
| | : |
| S.M., a Minor | : CP-51-DP-0003052-2017 |
| d/o/b: 11/●/2017 | : CP-51-AP-0000489-2020 |
| | : |
| Appeal of: | : Superior Court Nos.: |
| R.M., Father | : 1683 EDA 2021; 1684 EDA 2021 |
| | : CONSOLIDATED[1] |

## O P I N I O N

R.M. ("Father"), Appeals from the <u>Decree of Involuntary Termination of Parental Rights</u> and <u>Order of Goal Change to Adoption</u> entered by this Court on July 21, 2021, granting the Petitions to Involuntarily Terminate his Parental Rights to the above referenced Child, S.M., filed by the Department of Human Services ("DHS") on December 31, 2020. Father also Appeals this Court's granting the Petition for Goal Change also filed on December 31, 2020. In response to these Orders, Father, by and through his counsel filed <u>Notices of Appeal with Statement of Errors Complained of on Appeal</u> on August 19, 2021.

The parental rights of Mother, A.M. were involuntarily terminated as to S.M. on July 21, 2021. Mother filed Appeals on August 20, 2021 at 1698, and 1699 EDA 2021. Mother's Appeals are addressed under separate Opinion.

---

[1] 09/22/2021, Consolidated Sua Sponte. Comment: Review of these matters indicates that these appeals involve related parties and issues. Accordingly, the appeals at Nos. 1683 and 1684 EDA 2021 are hereby CONSOLIDATED. See Pa.R.A.P. 513.

1

## STATEMENT OF MATTERS COMPLAINED OF ON APPEAL

In his Statement of Matter Complained of on Appeal, Father raises the following issues:

1. The Trial Court erred in finding that Father had been duly served with the notice of the Termination Hearing, as required by the Juvenile Act and Court Rules;
2. The Trial Court erred in finding that DHS had met its burden to prove grounds for termination under 23 Pa.C.S.A., §2511 (a)(1);
3. The Trial Court erred in finding that DHS had met its burden to prove grounds for termination under 23 Pa.C.S.A., §2511 (a)(2);
4. The Trial Court erred in finding that DHS had met its burden to prove grounds for termination under 23 Pa.C.S.A., §2511 (a)(5)
5. The Trial Court erred in finding that DHS had met its burden to prove grounds for termination under 23 Pa.C.S.A., §2511 (a)(8)
6. The Trial Court erred by failing to find that DHS had failed to meet its burden to prove that termination would be in the child's best interest under 23 Pa.C.S.A., §2511 (b);
7. The Trial Court erred in changing the goal to Adoption; and
8. The Trial Court erred by denying due process of law to appellant, R.M., Father, as guaranteed by the Constitutions of the Commonwealth of Pennsylvania and of the United States of America;

## PROCEDURAL HISTORY:

A.M. (thereafter, "Mother") gave birth to a daughter, J.L.B. on November ●, 2009. M.B. (thereafter, "M.B.") is listed as Father on the Birth Certificate. (Exhibit "B" *Certification of Live Birth*, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020).

A.M. (thereafter, "Mother") gave birth to a daughter, S.M. on November ●, 2017. R.M. (thereafter, "R.M.") is listed as Father on the Birth Certificate. (Exhibit "B"

*Certification of Birth*, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020).

On October 31, 2017, DHS received a General Protective Services (GPS) Report alleging that on October 31, 2017, Child, J.L.B., was referred by school staff to Children's Hospital of Philadelphia (CHOP) because she was limping and in pain; that J.L.B. was diagnosed with recent extensive bruising and old linear hyperpigmentation on the backs of her legs; that the Children's Mother, A.M., told CHOP staff that, since around October 24, 2017, J.L.B. had jumped on a glass table with other children from church, had been hit repeatedly with a bat by another child, and fallen down steps; that S.M.'s Father, R.M. and Stepfather of J.L.B., arrived at CHOP after Mother and J.L.B. had arrived; that R.M., was verbally aggressive with CHOP staff; that Mother and R.M., disagreed regarding J.L.B. jumping on the glass table and being hit with a bat by the unidentified child; that R.M. became enraged in the treatment room, repeatedly listing his various accomplishments that led to the decision to remove the child that was hitting J.L.B. from the church; that he stated "I am a man of God"; that he repeatedly requested a more intensive treatment plan for J.L.B.; that he appeared unable to understand what CHOP staff was attempting to explain to him; that he was further angered at the discussion of J.L.B.'s safety while in the home; that R.M. failed to calm himself and stated he would be taking J.L.B. to her primary care physician; that R.M. threatened legal action before leaving the treatment room; that R.M. stated that he would return in ten minutes if Mother was not outside within that time, insinuating that he would exhibit further explosive behavior; that CHOP staff contacted the primary care physician listed for J.L.B. and was informed that the family does not go there for treatment; that Mother

3

appeared amenable to listening to CHOP's future treatment plan for J.L.B.; and that R.M. removed J.L.B. from CHOP against medical advice (AMA). This Report was determined as valid. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "a").

On November 1, 2017, DHS went to the family's home, but no one appeared to be at home. DHS left a letter requesting that Mother and R.M. contact DHS. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "b").

On November 1, 2017, DHS telephoned R.M., who was extremely hostile during the telephone call. He told DHS that the Agency has no authority to investigate the safety of J.L.B. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "c").

On November 2, 2017, DHS went to the family's home. DHS met with Mother and R.M. outside the home. DHS observed that R.M., stopped Mother from talking, stating that she should not be talking because she is pregnant. R.M., refused to allow DHS to have access to the home. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "d").

On November 3, 2017, Community Legal Services (CLS) telephoned DHS and stated that Mother and R.M., had attempted to retain CLS services as legal counsel; that CLS had explained the DHS investigation process to them and they were now willing to cooperate with DHS' investigation. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "e").

4

On November 3, 2017, DHS telephoned R.M., who agreed to a home visit on November 6, 2017. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "f").

On November 6, 2017, DHS went to J.L.B.'s school and met with her, who told DHS that on October 31, 2017, she was limping and in pain when she arrived at school because while she was at church, a three-year-old child had hit her on her leg with a bat and because she had fallen down stairs on October 31, 2017; that Mother did not stop the child from hitting her with the bat; and that R.M., has a history of hitting her on her legs with drumsticks when she fails to do her chores. DHS observed a bruise and linear marks on the backs of her legs. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "g").

On November 6, 2017, DHS went to the family's home and met with R.M., who stated that on October 31, 2017, he had taken J.L.B. from CHOP against medical advice because he felt that he was being discriminated against by CHOP staff and that he took J.L.B. for a medical examination with her primary care physician at Delaware Valley Community Center on November 1, 2017. He denied hitting J.L.B. and told DHS that there were no drumsticks in the house. DHS met with J.L.B., who again stated that R.M., has a history of hitting her with drumsticks and that he had two sets of drumsticks, one in the home and one at the church. DHS observed a set of drumsticks in the dining room of the home. R.M. again denied hitting J.L.B. and stated that she has a history of not telling the truth and that he was no longer willing to be involved in her care. DHS met with Mother, who told DHS that she is the primary disciplinarian for J.L.B. and denied that

5

R.M. had ever hit J.L.B. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "h").

On November 10, 2017, the October 31, 2017 GPS Report was upgraded to a Child Protective Services (CPS) Report. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "i").

On November 14, 2017, DHS learned that J.L.B. went to school that day and had a bruise on her left cheek. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "k").

On November 14, 2017, DHS went to J.L.B.'s school and met with her. DHS observed a bruise on J.L.B.'s left cheek. She stated that R.M. had hit her with his hand because she was misbehaving in the backseat of the family's automobile and that he had told her to tell DHS that no one had hit her. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "l").

DHS obtained an OPC for J.L.B. and S.M. on November 14, 2017. They were placed in a foster home through Children's Home of Easton (CHOE). (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "m").

A Shelter Care Hearing was held on November 16, 2017 before the Honorable Allan L. Tereshko. OPC was lifted and temporary legal custody transferred to DHS and placement in foster care through Children's Home of Easton. DHS to explore family finding. S.M. to have a full Child Abuse evaluation. Both Children safe as of 11/14/2017. (Shelter Care Order, 11/16/2017).

6

On December 12, 2017, The Community Umbrella Agency (CUA) Turning Points for Children (TP4C) held an Initial Single Case Plan (SCP) meeting. The parental objectives for Mother and Father were: 1) will attend parenting class and learn three non-physical forms of discipline; 2) attend and complete anger management class; 3) attend individual therapy; and 4) maintain contact with children per court order. Both parents appeared and participated in the SCP meeting. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "p").

On March 14, 2018, an adjudicatory hearing for S.M. was continued. The Court found that S.M. remained in a foster home through Children's Home of Easton and was safe as of 3/12/2018. (Continuance Order, 3/14/2018).

An Adjudicatory Hearing was held on March 14, 2018 for J.L.B. before the Honorable Allan L. Tereshko. The Child was found to be a Dependent Child. Legal Custody remains with DHS, and placement continues in foster care through Children's Home of Easton. Child found J.L.B. as victim of child abuse as to Mother and Stepfather, R.M. Reunification efforts must continue. Supervised visits as arranged, and parents are to have an additional 4 hours for visits. Child receives therapy through Children's Home of Easton. Mother and Stepfather, R.M., referred to BHS for consultations and/or evaluations. Motion is granted allowing J.L.B.'s out of court statements to be admitted. Individual therapy to continue for the child and family therapy incorporated when therapist deems appropriate. Mother and R.M. referred to ARC for parenting. (Order of Adjudication and Disposition, 3/14/2018).

On April 19, 2018, the Court deferred adjudication for S.M., as parents' counsel was not present and Court ordered Mother and Father, R.M., to receive forthwith Parenting Capacity Evaluations (PCE). (Continuance Order, 4/19/2018).

On May 8, 2018, adjudication of S.M. was deferred and hearing continued to allow parents to hire new counsel because they do not wish to continue being represented by current counsel. DHS to work with parents for visitation in accordance with work schedule. Both J.L.B. and S.M. are safe as of 4/18/2018. (Status Review Order, 5/08/2018) (Continuance Order, 5/08/2018).

An Adjudicatory Hearing was held for S.M. on June 27, 2018 before the Honorable Allan L. Tereshko. Child found to be Dependent Child and legal custody remains with DHS, and placement continues in foster care through Children's Home of Easton. Child is medically up to date and not receiving services. The parents hired private counsel to represent them jointly. Parents were referred for a PCE; that the parents were to complete parenting at ARC; and that the parents were to have weekly extended supervised visits at Agency and weekend overnight visits every other weekend from Saturday 10 a.m. until Sunday 7 p.m. CUA to do pop ups at the parent's home during weekend overnight visits. Father completed anger management. (Order of Adjudication and Disposition, 6/27/2018).

On September 20, 2018, CUA-TP4C held a revised SCP meeting. The parental objectives for Mother and R.M. were: 1) maintain contact with children per court order; 2) complete court ordered PCE and follow all recommendations; and 3) participate in family therapy when appropriate. Both parents appeared and participated in the SCP

meeting. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "w").

On September 26, 2018, a permanency review hearing was held before the Honorable Allan L. Tereshko. Legal custody remains with DHS and placement continues in foster care through CHOE. Parents have weekly supervised visits with the Child at the Agency and biweekly overnight unsupervised visits in their home. Visits are to continue as arranged. S.M. is up to date with medical and immunizations. S.M. does not receive any special services at this time and is doing well. Mother and Father are scheduled for PCE for 10/23/2018. Parents to comply with PCE, which is expedited. PCE is to examine the capacity of both siblings in a separate light. S.M. to be moved to the foster care home with sibling, and all parties notified. Child safe as of 9/12/2018. (Permanency Review Order, 9/26/2018).

A Permanency Review Hearing was held for S.M. on November 21, 2018 before the Honorable Allan L. Tereshko. Legal custody remains with DHS and placement continues in foster care through CHOE. Child attends daycare and is medically up to date. Parents to continue bi-weekly overnight visits and they may extend visits from the weekend to Christmas, CUA to make arrangements. Child safe as of 11/07/2018. (Permanency Review Order, 11/21/2018).

On December 20, 2018, CUA-TP4C held a revised SCP meeting. The parental objectives for Mother and R.M. remained the same as the objectives given at the September 20, 2018 SCP meeting. Both parents attended and participated in the SCP meeting by telephone. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "z").

9

On January 2, 2019, a Permanency Review Hearing was held for S.M. before the Honorable Allan L. Tereshko. Legal custody remains with DHS, and placements remains in foster care at CHOE. Parents to have supervised visits at CHOE. Father to provide DHS with a copy of both Birth Certificates and Immigration Certificate and ordered a full FBI background to be obtained for Mother and Father. Child safe as of 12/06/2018. (Permanency Review Order, 1/02/2019).

On March 12, 2019, a Permanency Review Hearing was held before the Honorable Allan L. Tereshko. Legal custody remains with DHS and placement continues in foster care at CHOE. Child is up to date with medical, dental and receiving therapeutic services. Child is up to date with medical and dental and scheduled to have tubes placed in ear on 3/25/2019 at Lehigh Valley Hospital. Parents signed consents. Child safe as of 2/14/2019. Parents hired new counsel. (Permanency Review Order, 3/12/2019).

On May 8, 2019, a Permanency Review Hearing was held before the Honorable Allan L. Tereshko. Legal custody remains with DHS, and placements continues in foster care. Child's Father, R.M., visitation modified to every other week supervised by a visitation coach provided to C.H.O.E. CUA to explore placement of siblings together. ACS to subpoena visitation coach for next court listing. Child safe as of 4/11/2019. (Permanency Review Hearing Order, 5/08/2019).

On June 10, 2019, CUA-TP4C held a revised SCP meeting. The parental objectives for Mother and S.M.'s Father, R.M. remained the same as the objectives given at the September 20, 2018 SCP meeting. Both parents attended and participated in the SCP meeting. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "dd").

10

On August 28, 2019, Permanency Review Hearing was held before the Honorable Allan L. Tereshko. Legal custody remains with DHS, and placement continues in foster care. Visitation for Father to remain as status quo. Mother and R.M. to resubmit for a PCE, for it to be expedited, and it to include Minnesota Multiphasic Personality Inventory. Mother to produce an original divorce decree as to M.B. Child safe as of 8/14/2019. (Permanency Review Order, 8/28/2019).

On November 20, 2019, a Permanency Review Hearing was held before the Honorable Allan L. Tereshko. Legal custody remains with DHS, and placement continues in foster care through CHOE. Father to continue with bi-weekly supervised visits with Child at Agency. Father, R.M. to provide CUA with all necessary documents requested by Dr. Russell forthwith. R.M. was employed at Med Transit until 10/20/2019 but is currently employed by Uber. Child safe as of 11/15/2019. (Permanency Review Order, 11/20/2019).

On January 22, 2020, a Permanency Review Hearing was held before the Honorable Allan L. Tereshko. Legal custody remained with DHS, and placement continued in foster care through CHOE. Visitation by Father, R.M., with S.M. may be modified by agreement of the parties prior to next court date. CUA to explore family resources as identified today. Order amended to include Ms. Mills, or any non-authorized person is NOT to attend visits. (Permanency Review Order—Amended, 1/22/2020).

On February 27, 2020, CUA-TP4C held a revised SCP meeting. The parental objectives for R.M., were: 1) maintain contact with S.M. as per court order; 2) complete the second portion of the PCE per the court order; 3) participate in family therapy when

11

appropriate; 4) refrain from inappropriate forms of discipline; 5) follow all court ordered services; 6) provide documentation of all completed court ordered services and expectations; 7) ensure that S.M.'s medical, dental and vision needs are met; and 8) avail himself to CUA for case planning. Neither parent attended nor participated in the SCP meeting. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "ii").

On September 3, 2020, a Permanency Review Hearing was held before the Honorable Allan L. Tereshko. Legal custody remains with DHS, and placement continues in foster care through CHOE. S.M. is 3 years old and doing well in the home and up to date with medical and dental. Visits with parents can be modified by agreement of the parties. Father, R.M., CUA to make releases available for Father's signature. Father to be compliant with CUA and provide CUA with documentation of employment, work schedule, therapist name, sign release and housing. Father's therapist to provide treatment plan, progress report and attendance within 30 days. Child safe as of 9/01/2020. (Permanency Review Order, 9/03/2020).

On January 20, 2021, a Permanency Review Hearing was held before the Honorable Allan L. Tereshko. Legal custody remains with DHS, and placement continues in foster care through New Foundation. All prior orders as to parents to stand. Visitation between S.M. and Father, R.M., shall be phone contact supervised by CHOE at Child's discretion. Child safe as of 1/14/2021. (Permanency Review Order, 1/20/2021).

On March 9, 2021 at Status Review Hearing was held for S.M. before the Honorable Allan L. Tereshko. Remain as committed and placed. Father's in-person visits are suspended. Father to have 1 hour supervised virtual visit a week. Stay Away

Order issued to Father, R.M., to stay away from A.J. Cordi, Nicole Beauchamp, Jean Mazzarese, Beverly Pearson and the Children's Home of Easton located at 2000 S. 25th St., Easton, PA 18042. (Status Review Order, 3/09/2021).

On April 22, 2021, a Permanency Review Hearing was held before the Honorable Allan L. Tereshko. Legal custody remains with DHS, and S.M.'s placement to remain in foster care through CHOE. Child to remain as committed. All attorneys to submit their closing arguments in writing to the Judge within 30 days and to be emailed to the Court. The cases are held under advisement and the Court will render a decision. (Permanency Review Order, 4/22/2021).

## STANDARD OF REVIEW AND LEGAL ANALYSIS

When reviewing an appeal from a decree terminating parental rights, an appellate court is limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, an appellate court must accord the hearing judge's decision the same deference that it would give to a jury verdict. The Pennsylvania Superior Court need only agree with a trial court's decision as to any one subsection under 23 P.C.S.A. §2511 (a) in order to affirm a termination of parental rights. *In re D.A.T. 91 A.3d 197 Pa.Super.2014)*.

The standard of review in termination of parental rights cases requires appellate Courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A

13

decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. In re T.S.M., 620 Pa. 602, 71 A.3d 251, 267 (2013) (citations, quotation marks omitted) In re Adoption of C.D.R., 2015 PA Super 54, 111 A.3d. 1212, 1215 (2015).

**The Trial Court Properly Found that DHS had met its Burden by Clear and Convincing Evidence to Involuntarily Terminate Father, R.M.'s Parental Rights Pursuant to 23 Pa.C.S.A. §2511 (a)(2), (5) (8) and 2511 (b)** [2]

Involuntary termination of parental rights is governed by § 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938. As the party petitioning for termination of parental rights,

---

[2] **23 Pa.C.S.A. §2511 (a) General Rule.**—the rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds: (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parenting claim to a child or has refused or failed to perform parental duties. (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent. (5) The child has been removed from the care of the parents by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child. (8) The child has been removed from the care of the parent by the court or under voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of the parental rights would best serve the needs and welfare of the child.

**23 Pa.C.S.A. §2511 (b). Other Considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1),(6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

DHS "must prove the statutory criteria for that termination by at least clear and convincing evidence." *In re T.R.,* 465 A.2d 642, 644 (Pa. 1983). Clear and convincing evidence is defined as "testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Matter of Sylvester*, 555 A.2d 1202, 1203-04 (Pa.1989).

Termination of parental rights is governed by Section 2511 of the Adoption Act 23 Pa.C.S.A. §§ 2101–2938, which requires a bifurcated analysis. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond. *In re L.M.,* 923 A.2d 505, 511 (Pa.Super.2007) (citations omitted). In re Adoption of C.J.J.P., 2015 PA Super 80, 114 A.3d 1046, 1049-50 (2015). The Court need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. In re Adoption of C.J.J.P., 2015 PA Super 80, 114 A.3d 1046, 1050 (2015).

Father alleges this Court committed reversible error when it involuntarily terminated his parental rights where such determination was not supported by clear and

convincing evidence under 23 Pa.C.S.A. §§2511 (a) (1), (2), (5), (8) and 2511 (b). This Court disagrees.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

DHS became aware of J.L.B. on October 31, 2017, when it received a General Protective Services (GPS) Report alleging that on October 31, 2017, seven year old J.L.B., was referred by school staff to Children's Hospital of Philadelphia (CHOP) because she was limping and in pain and she told them Stepfather, R.M., hits her on her legs with drumsticks when she fails to do her chores. DHS observed a bruise and linear marks on the backs of her legs. J.L.B. was diagnosed with recent extensive bruising and old linear hyperpigmentation on the backs of her legs; the Children's Mother, A.M., told CHOP staff that, since around October 24, 2017, J.L.B. had jumped on a glass table with other children from church, had been hit repeatedly with a bat by another child, and fallen down steps. (CPS Report, 10/31/2017, Exhibit DHS 4).

On November 13, 2017, Mother gave birth to S.M. R.M. is listed as the Father on the Birth Certificate. (Exhibit "B" *Certification of Birth*, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020).

On November 15, 2017, DHS obtained an Order of Protective Custody (OPC) for J.L.B. and removed her from the home of her Mother and Stepfather, R.M. On December 26, 2017, DHS indicated the Child Protection Services (CPS) Report naming Mother and R.M. as perpetrators of abuse for causing bodily injury to a child through a recent act or failure to act (Exhibit DHS-4).

On November 16, 2017, this Court transferred legal custody of both Children to DHS and placed them in foster care through Children's Home of Easton. (Shelter Care Orders, 11/16/2017).

On March 14, 2018 this Court adjudicated J.L.B. Dependent and found her to be the victim of child abuse as defined by 23 Pa.C.S. §6303 and the perpetrators were found to be Mother and Stepfather, R.M. (Order of Adjudication and Disposition, 3/14/2018).

On June 27, 2018, this Court adjudicated S.M. Dependent and legal custody remained with DHS, and placement continued in foster care through Children's Home of Easton. (Order of Adjudication and Disposition, 6/27/2018).

On October 23, 2018, William Russell, Ph.D., licensed psychologist conducted a court ordered Parenting Capacity Evaluation (PCE) on Mother and Father, R.M., to assess their ability to provide safety and permanency for the Children. He interviewed R.M. and reviewed available records. Father reported, regarding his step-daughter, J.L.B., "has a lying spirit and that she did not want another sister. She was jealous and would go out of character to get attention" He reported his FSP objectives included completing parenting and anger management, participate in family therapy, attend a court order mental health evaluation and completing the PCE. He noted he completed parenting and anger management courses at ARC. He reported he had supervised visits

with S.M. every Thursday and overnight visits with her every other weekend. He does not have contact with J.L.B. He reported he lived with his wife in a three-bedroom home at 7038 Saybrook Ave., Philadelphia PA 19142. He reported he works full-time at a Chase Bank call center and works full-time as a Pastor. Father denied he had any juvenile or adult arrest history. The CUA Clearance Request Form for Father dated 4/20/2018, had no information on it to either confirm or deny his reports of his criminal history. R.M. denied that he has ever been the victim or perpetrator of domestic violence. Based on this evaluation, Dr. Russell recommended the family should participate in family therapy to assist R.M. in understanding the development of children. Family therapy should commence prior to the consideration of reunification of J.L.B. based on the nature of the relationship between J.L.B. and R.M. R.M. to participate in classes to learn appropriate ways to discipline. Visitation with the Children should progress at the direction of the family therapist. (Report of Forensic Evaluation by William Russell, Ph.D., 10/23/2018) (Exhibit, DHS-2).

On May 8, 2019 this Court held a Permanency Review Hearing and R.M. testified he attended the PCE with Dr. Russell on 10/23/2018, and that Dr. Russell only asked him about child abuse and nothing else. When asked whether he denied whether he was a victim or perpetrator of domestic violence, he stated he was asked, 'victim or perpetrator of domestic violence with child abuse. I said no." (N.T., 5/08/2019, pp.9-10 at 1-25, p.11 at 1-2).

R.M., then was questioned about his FBI report by Ms. Schiffman, Esquire, attorney for DHS, and was asked whether he recalled being arrested on 3/11/2011 in Rhode Island for domestic disorderly conduct, and 4/06/2011 for violation of a no-

contact order, and R.M. responded yes. He was asked whether he recalled being arrested 7/12/2011 for violating a no-contact order, simple assault or battery, and resisting arrest and he was convicted and sentenced to a one-year probation. He responded yes. He was asked about arrests on 8/04/2011 and an arrest on 8/31/2011 for attempted breaking and entering domestic, and he responded yes. R.M. again stated Dr. Russell only asked him about child abuse and he refused to answer any other questions regarding his arrest record. (N.T., 5/08/2019, p.11 at 18-25, p.12 at 1-19, p.13 at 1-25, p.14 at 1-21) (New York State Division of Criminal Justice Services, Criminal History RecordExhibit-DHS-12) (US Department of Justice FBI-Exhibit-DHS-13).

R.M. was then asked his date of birth and he responded it was 9/12/1988 and he denied that a fingerprint card dated 10/23/2010 with a birthdate of 8/12/1988 was his. He stated the address on the fingerprint card was correct and he did live at 1066 Fulton Street in Brooklyn NY but denied they were his fingerprints. R.M. denied the photo on the certified copy of the criminal history information report from the New York State Division of Criminal Justice Services was him and that he was a victim of identity theft. R.M. was then asked if he was arrested and charged with a felony of identity theft, assuming another's identity obtaining goods worth over $500 on 6/09/2008, and was convicted upon a guilty plea, and he responded yes. R.M. was asked if he was arrested for impersonating a police officer in 2009, and multiple charges for identity and property theft in 6/12/2012 and sentenced to 18 months to three years for grand larceny and served time in jail; R.M. responded yes, absolutely. (N.T., 5/08/2019, p.17 at 1-25, p.18 at 1-13, pp.19-20 at 1-25, p.21 at 23-25, p 22 at 1-15, p.24 at 16-24, p.25 at 1-25, p.26 at 1-18).

19

(New York State Division of Criminal Justice Services, Criminal History RecordExhibit-DHS-12) (US Department of Justice FBI-Exhibit-DHS-13).

R.M. denied he lied to Dr. Russell when he responded he had no history of juvenile or adult arrest and stated that he was only asked in reference to child abuse and therefore he did not lie. When questioned about his LinkedIn profile naming him Dr. Apostle Robertson Mulbah and listing his education as receiving a bachelor's degree in theology and religious vocations from Cornell University, R.M. stated he attended Cornell at 52nd street and Eighth Avenue in Manhattan, not in Ithaca NY. R.M. was then shown a letter from the senior academic record specialist, Rodney Orme, confirming that Cornell University had no academic records for a Robertson Mulbah for both undergraduate and graduate level education, and that Cornell University does not offer a major or a field of study of theology, he stated, "of course it do, I don't know where you get that from." He then stated he told Dr. Russell that he received a scholarship from Manhattan Comprehensive Night and Day High School, and he did not want anyone to assassinate Dr. Russell's name or character and that Dr. Russell was a good man and that his language in the report was misinterpreted and that was not what he meant. R.M. did not provide proof of his graduate and undergraduate degrees but stated he would bring them. (N.T., 5/08/2019, p.27 at 4-25, pp.28-29 at 1-25, p.30 at 1-15, p.31 at 1-19, p.32 at 1-25) (LinkedIn-Exhibit -DHS-14) (Cornell University Letter-Exhibit-DHS-15) (Cornell College Letter-Exhibit-DHS-16).

At the Permanency Review Hearing on August 28, 2019, this Court heard Expert testimony from William Russell, Psychologist, who conducted Parenting Capacity Evaluations (PCE) on Mother and Father, R.M., on October 23, 2018. He testified that at

that time he concluded there were concerns regarding the safety of the Children and that there were a number of recommendations that should be followed. He noted that he was provided a copy of the Notes of Testimony from a hearing held on May 8, 2019, which he reviewed. He noted that he became aware that Mother and Father, R.M., has separated and no longer lived together. He was also aware that Mother and Father, R.M. obtained Protection From Abuse Orders against each other subsequent to the May 8, 2019 hearing. (N.T., 8/28/2019, p.8 at 16-25, pp.9-11 at 1-25, p.12 at 1-24, p.13 at 1-3).

Dr. Russell testified that based on the noted new information he obtained he had changed his opinion as to the parents since his initial PCE's. With regard to Father, R.M., he stated the information provided at the initial evaluation was in direct contrast to the information that was evident in the May 8, 2019 hearing. Quite a number of aspects of R.M.'s life that he presented to Dr. Russell were refuted during the subsequent May 8, 2019 hearing. And because of that, any opinion that he gave regarding R.M. as a result of the October 23, 2018 evaluation and the information he was given, that initial opinion would not be valid. He noted that it did not make a difference that the parents were physically separated. He testified that much of the information provided to him by Mother and R.M. was later found to be inaccurate or false. Both parents used almost the exact same wording to describe what occurred during the evaluation process. That direct examination and cross-examination reflected that the two of them were sharing information and were practicing whatever they were going to say to the Court. (N.T., 8/28/2019, p.13 at 4-25, p.14 at 1-22).

Dr. Russell testified that his opinion that Mother and Father, R.M., were not able to provide safety at the end of evaluation would still stand, unless he was shown

21

something dramatically different from one of the parents. He noted that if he was redoing an evaluation, clearly all of the information that was demonstrated to be of questionable accuracy, clearly false information, would need to be provided to him. He believed both parents were lying to him at the initial PCE and they were coordinating their misrepresentations. Therefore, the PCE conducted on R.M. on 10/23/2018 was not valid. Dr. Russell opined upon questioning by this Court whether either parent's will to speak was overridden by the other parent, and thus they were not incapable of knowing or speaking the truth as they perceived it, he stated he did not believe that. (N.T., 8/28/2019, p.15 at 2-24, p.18 at 1-22, p.19 at 1-18).

At the conclusion of this hearing, this Court ordered Mother and Father, R.M., resubmit for PCE to expedited and to include Minnesota Multiphasic Personality Inventory. This Court stated, "the reason behind that is that one of the primary issues here is deception. And having been able to see the results of MMP's in the past, they have a potential for providing the level of deception that the parties are engaged in. It's not the absolute proof as such, but it's one of the tools used, and the Court, as finder of fact could use in determining whether or not the parties are deceptive, in whole or in part." (N.T., 8/28/2019, p.17 at 3-16) (Permanency Review Order, 8/28/2019).

On January 3, 2021, Dr. Russell conducted a subsequent PCE on Father, R.M. This was ordered because during the May 8, 2019 hearing, both Mother and Father attempted to state that they were under the impression that all the questions during the previous PCE were focused solely about their history of child abuse. Father and Mother, in the Court's opinion, were covering up for each other up until the May hearing. The Court questioned the credibility and accountability of both parents. R.M. reported to Dr.

Russell that he was in the process of obtaining a divorce from the Mother of his child because living with her was like "living with the devil." He stated he has a PFA against her and that she has been arrested twice for violating the order. He reported she has stolen money from him and that prior to dating her, he was aware she was a prostitute and had traumatic relationships previously. He reported his visitation schedule with S.M. is every other week for two hours. The visits were held at Children's Home of Easton and the visits were supervised. He reported attending and completing parenting and anger management classes. R.M. reported a different educational history than at the previous PCE and that he did not believe in education because there is too much confusion and discrepancies with college. He reported attending individual therapy and attended every other week with Christina Samyan, MSW, who diagnosed him with generalized anxiety disorder. He stopped the therapy because of his busy schedule. R.M. provided a different employment history than his previous PCE and when confronted he became agitated. He reported he was arrested three times and was arrested for grandiosity and identity theft when he was 19 years old. The results of the MMPI-2-RF showed a score on the Variable Response/Inconsistency Scale (VRIN) which shows that he understood and responded to the items in a consistent manner. His elevation on the Infrequency Scale reflects identity and self-esteem issues, as well as psychopathology. He responded with a significant elevation on the Lie Scale (L). Dr. Russell noted that the negative factors of the PCE impact R.M.'s ability to provide a permanent, safe environment for his Child. He noted that R.M. has ongoing problems in presenting important information in a believable manner; his history of criminal behavior, his difficulty in sustaining romantic relationships; his pattern of lateness for important appointments; the unexplained injuries

23

to his Stepdaughter, and his failure to complete necessary programs. All these facts are complicated because he has never served in the role of central caregiver for his Child. Dr. Russell opined it appears that R.M. has a narcistic personality disorder (NPD) and a pattern of pathological lying. The negative issues described raise questions about R.M.'s current ability to provide a permanent safe environment. There is no single overriding issue of concern but rather it is the historical pattern of distorting or providing patently false information about himself combined with the issues described and its potential impact on his Child. He opined it was paramount that he address the raised concerns. He further opined, that if reunification remains the goal, to move forward, R.M. needs to comply with recommendations made previously. He needs to attend individual therapy to increase his insight into how his presentation and behavior impacts others and adds to his internal need for attention and flattery, his moodiness, his difficulties in personal interactions, and his oversensitivity in the face of criticism. R.M. must demonstrate consistent compliance with the above and any other service plan objectives for a period of at least six months. (Report of Forensic Evaluation, 1/03/2021, Exhibit, DHS-10).

At the hearing on 4/22/2021 Dr. Russell testified again before this Court and stated he conducted two interviews with R.M., one on 2/05/2020 and October 2020. He also administered a MMPI-2-RF test. Dr. Russell stated the information R.M. provided during the 2020 interviews was different that the information he provided during the 2018 interviews. He asked him why he was untruthful at the first PCE, and R.M. responded that he didn't understand the question or miscommunication and all of his responses regarding discrepancies revolved around that he didn't understand or there was a problem with communication. R.M. did not take responsibility for any of the

24

miscommunications. Regarding the L-scale, looks at individuals who present as having a lifestyle or response that allows them to look good. They want to appear that they do not have any faults. R.M. presented with a significant elevation on the L-scale. He opined that R.M. presents with all of the factors that make up a narcissistic personality disorder. Dr. Russell added that R.M. has a historical pattern of distorting or providing patently false information and that does impact his ability to provide a safe environment for his Child. The negative factors that come out of his personality disorder such as never being a central caretaker for his Child, no accountability for the past physical abuse with J.L.B., the historical criminal behavior, and his difficulty sustaining relationships. Regarding why his Child is under court supervision, R.M. was able to understand that the hitting of the Child was the reason for the involvement, but he did not articulate who did the hitting, how it was done, why it was done, and he was emphatic that it was not him that did it. R.M. further stated he was open to participating in mental health therapy because he was told to comply with the orders. (N.T., 4/22/2021, pp.178-179 at 1-25, p.184 at 1-25, p.188 at 19-25, p.189 at 1-17, p.193 at 1-18, pp.194-195 at 1-25, p.196 at 1-4, p.200 at 18-25, p.201 at 1-6, p.203 at 18-25, p.204 at 1-5).

Patrice Garvey, Case Manager Supervisor, testified that R.M.'s SCP objectives were to maintain contact with his Child, complete the second portion of the PCE, participate in family therapy when appropriate, to participate in individual therapy, and learn appropriate forms of discipline and follow all court ordered services. He was to provide pay stubs, make sure the Child's medical and dental examinations were up to date, maintain appropriate housing and provide all documentation to CUA. (N.T. 4/22/2021, p.214 at 1-18).

25

Ms. Garvey testified that R.M. completed the PCE, and that family therapy has not been ordered. She stated she did not have any information regarding his attendance at individual therapy. She opined that R.M. has not learned proper forms of discipline, although he did complete parenting class. She further opined that R.M. has not updated documentation to her since 2019 and 2020 regarding pay stubs and housing. She stated to the best of her knowledge, R.M. has not attended S.M.'s medical or dental appointments. (N.T., 4/22/2021, p.214 at 19-25, pp.215-216 at 1-25).

Ms. Garvey testified both she and Ms. Pearson requested and obtained stay away orders to keep R.M. away from them because he made several threats to them when he told them he had voodoo dolls that reflect on them individually and that he knows where they work, and that he knows people in high positions who can do stuff to them. She also stated that R.M. told her he has voodoo dolls of various other people, including the Judge and Ms. Schiffman, the attorney for DHS. (N.T., 4/22/2021, p.219 at 1-25).

Ms. Garvey testified she last saw S.M. 3/24/2021, at the foster home and describes the relationship between the Child and the foster parent as a loving maternal bond. The Child looks to her foster parent for her emotional and physical needs. She further stated she has never seen the Child with her Father. She opined that S.M. would not suffer irreparable harm if Father's parental rights were terminated because she is strongly bonded to her foster parents and it would be in her best interests to free her for adoption. (N.T., 4/22/2021, p.220 at 3-25, p.221 at 1-14, p.244 at 15-25, p.245 at 1-5).

This Court also heard persuasive, credible testimony from Nicole Beauchamp, foster care worker from Children's Home of Easton (CHOE). She is the liaison for the Children that are in foster care as well as for the foster families, the Agency and the

26

biological families. She began working with the Children and the families in September 2018, and she supervised visits between the Children and the parents. The visits were twice a month and she supervised until June of 2019 when Mother and R.M. separated and the visitation schedule changed. (N.T., 1/20/2021, p.26 at 17-25, pp.27-28 at 1-25, p.30 at 16-18).

Ms. Beauchamp testified the relationship between S.M. and the foster parents is very positive. She noted that because the Child was so young and because she has been with this foster family for 2 years of her 3 and ½ years of life, they are essentially her parents. S.M. does not really know anything different at this point. She noted the foster family wants to adopt both S.M. and her sibling, J.L.B. She opined the Child would not suffer irreparable harm if Father's parental rights were terminated and it would be in the Child's best interest to be adopted by her foster parents. (N.T., 4/22/2021, p.288 at 13-20, p.293 at 4-21).

This Court heard credible, persuasive testimony from A.J. Cordi, Program Director, Children's Home of Easton (CHOE). He testified he is the director of foster care and adoption at CHOE and that he supervised the visits between S.M., and Father, R.M., since March 2020. The visits were every other week for two hours. He noted that from March 2020 to September 2020 the visits were virtual. He stated that from March 24, 2020 until the beginning of May 2020 no visits occurred between them because Father did not call in to schedule the visits. Virtual visits began again in May 2020 and he described the visits as not very engaging. Father had nothing planned for the visits and he would put on a cartoon or music for S.M. to watch and he wasn't on the screen. He noted this happened frequently. He noted that when Father would come on screen,

the Child would be very quiet, and it would take a while for her to begin engaging. He stated that in-person visits resumed about mid-September 2020 and the Child was more engaged. Father would not bring activity things for the Child, but he would bring food for her. (N.T., 4/22/2021, p.303 at 18-25, pp.304-305 at 1-25, p.307 at 15-25, p.308 at 1-25, p.309 at 1-24, p.311 at 3-25, p.312 at 1-18).

Mr. Cordi testified about an incident that occurred during Father's visit with S.M. on 1/14/2021. Father questioned him about why Beverly was still involved with his case and what the point was of supervised visits. Father called the Judge racist and challenged him as to whether he was a racist too. Father claimed the whole system was out to get him and claimed the Court purposely placed S.M. at CHOE because it was far away, and he could not get there. Father acted this way in front of S.M. and she began crying, whereupon Father provided no comfort instead stated the Child was fine. Mr. Cordi had to summon additional staff to assist him with the situation. Father was not escorted out but left on his own. He noted the Child was very frightened after the visit and she made the comments that her daddy frightened her. Mr. Cordi testified that as a result of this incident, CHOE suspended visits with Father until an emergency hearing was held on March 9, 2021. At that hearing this Court issued stay away orders to prevent Father from contacting him and Ms. Beauchamp at CHOE. This Court did not suspend visits between Father and S.M. but changed the visits to virtual visits. (N.T., 4/22/2021, p.314 at 22-25, p.315 at 1-25, p.316 at 1-17, p.317 at 6-25, p.318 at 1-24) (Status Review Order, 3/09/2021).

Regarding S.M.'s relationship with her foster family, Mr. Cordi testified he sees the Child in the home usually once or twice a month. He described the Child's

relationship as a parental bond with the foster parents and a family bond with the entire family. The Child looks to her foster parents for care, needs, comfort, support and safety and refers to her foster parent as Mommy. He opined S.M. would not suffer irreparable harm if Father's parental rights were terminated and it would be in her best interest to be freed to be adopted by her foster parents. (N.T., 4/22/2021 p.319 at 4-25, p.320 at 1-25, p.321 at 1-7).

Father, R.M., was next to testified and stated he receives therapy at Safe Serenity Safe Haven, an outpatient clinic, at 5521 Chester Ave. He stated he was first there in January of 2021 and did an intake on 2/19/2021. He testified he treated with Mr. Darryl and has completed three sessions and he will call to schedule another session. He stated he discussed his PCE with the therapist and also discussed Dr. Russell's diagnosis of narcissistic personality disorder. Father stated he takes full responsibility for what happened and is very regretful. (N.T., 4/22/2021, p.389 at 1-25, p.392 at 15-25, p.393 at 1-25, p.394 at 1-25, p.395 at 1-24, p.396 at 1-25, p.397 at 1-10).

Regarding his FSP objectives, Father stated he owns a house at 7279 Saybrook Ave., and has lived there since he separated from his wife. He stated he works at Manpower doing temporary sorting work for FedEx and he gave proof of his employment to the CUA. Father stated he did not know how or who to contact at CHOE after the stay away order was issued, and no one helped him to make contact with his daughter. (N.T., 4/22/2021, p.397 at 11-25, p.398 at 1-25, p 399 at 1-25, p.400 at 1).

On cross-examination by Elizabeth Flanagan, Esquire, Child Advocate, Father testified he was not aware that therapy was an FSP objective. He stated he did participate in the FSP meetings but did not recall if he was ever provided with a copy of

the plan. He stated that he provided documentation of his employment to CUA and their testimony that he did not was inaccurate. When asked about not scheduling virtual visits after the stay away order was issued, Father stated he did not contact his attorney for assistance and did not reach out to anyone for assistance regarding the visits. (N.T., 4/22/2021, p.402 at 24-25, p.403 at 1-25, p.404 at 1-16).

This Court finds that Father has lied and manipulated information throughout this case. A secondary PCE was ordered because of the blatant dishonesty of the Father and Mother at the first PCE. Dr. Russell testified that Father's elevated score on scale L, (Lie scale) cannot be attributed to an inability to understand the content of the items presented. He stated these results suggests that Father's elevation on scale L was a deliberate attempt to appear without faults. Father's clinical results are similar to individuals who are often described as being suspicious of others and their motive. They see malicious intent in the action of others and often blame others for their difficulties. Their mistrust of others can cause difficulties in interpersonal relationships: thus, these individuals are often alienated from others. This Court finds Father's testimony not credible and the level of deception is so clearly refuted by the physical evidence that this Court must question everything Father says or does.

Therefore, this Court finds that DHS has provided clear and convincing evidence that Father continues the incapacity to parent. He has not taken responsibility for his role in the abuse to his Stepdaughter, J.L.B., which led to the removal of the Children from his care. The evidence by caseworkers and social workers shows that Father does not have a parent-child bond with S.M., and that the Child has a parental bond with her foster parent. This Court finds that Father is incapable of providing safety and permanency for

30

this Child now and in the future. Father failed to act on opportunities to get to know the Child and failed to take meaningful steps to be involved in her life. The conditions which necessitated her placement exist today. The evidence leave no doubt that Father cannot and will not remedy the conditions which brought this Child into supervision. Here, the totality of the evidence supports this Court's finding that termination of Father's parental rights is in this Child's best interest and the needs and welfare of this Child would best be served by termination, pursuant to 23 Pa.C.S.A. §§2511 (a)(2)(5)(8) and (b).

**This Court Properly Found that the Goal Change from Return to Parent to Adoption was in this Child's Best Interest and the Court's Disposition was Best Suited to the Safety, Protection and Physical, Mental and Moral Welfare of the Child Pursuant to 42 Pa.C.S.A. §6351 (f.1) (2).[3]**

The concept of a "goal change" is consistent with the statute which requires the trial court, at the conclusion of a permanency hearing in a child dependency proceeding, to order the continuation, modification, or termination of placement or other disposition which is best suited to the safety, protection and physical, mental, and moral welfare of the child; an order to continue, modify, or terminate the current placement, as required by the statute, is synonymous with a decision to continue or change the permanency plan goal. 42 Pa.C.S.A. § 6351(g).

This Court heard credible, persuasive testimony from Ms. Beauchamp who testified she has observed the interaction between the two Children and their current foster care parents. She noted that the relationship is very positive. The foster parents

---

[3] **42 Pa.C.S.A. §6351-Disposition of dependent Child.—(f.1). Additional determinations.** Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following: (2) If and when the Child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the Child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the Child.

are willing to adopt the two girls. The two sisters, J.L.B. and S.M. are very attached to each other and have spent most of the time together. J.L.B. has expressed she does not want to be separated from her sister under no circumstances. (N.T., 1/20/2021, p.44 at 7-25, p.45 at 1-25, p.46 at 1-11).

Regarding S.M.'s relationship with her foster family, Mr. Cordi testified he sees the Child in the home usually once or twice a month. He described the Child's relationship as a parental bond with the foster parents and a family bond with the entire family. The Child looks to her foster parents for care, needs, comfort, support and safety and refers to her foster parent as mommy. (N.T., 4/22/2021 p.319 at 4-25, p.320 at 1-25).

This Court finds the Record sustains the factual findings and legal conclusions regarding this Child's current placement, and most importantly, the record demonstrates that Reunification is not feasible and not in this Child's best interest. Competent, credible, persuasive testimony was presented by DHS to demonstrate that Father was not able to provide appropriate parental care or control for this Child, and it would be in the Child's best interest to be adopted by the foster parents. This Court finds that DHS met its burden to support the goal change from Reunification to Adoption. Adoption has been clearly established as the appropriate goal in the best interest of this Child and is best suited to for her safety, protection and physical, mental and moral welfare.

## DUE PROCESS AND SERVICE

Father alleges that he was denied due process under the law as guaranteed by the Constitutions of the Commonwealth of Pennsylvania and the United States. This broad assertion does not state the basis of the denial of his due process and equal

32

protection rights, and this Court cannot speculate what Father's allegations are. The Court finds that Father was never denied the opportunity to participate, testify, and present evidence on his own behalf. He participated and testified at the hearings. His attorney was also present at the hearing and presented evidence on his behalf. Accordingly, this Court finds that Father was never denied a fair and impartial hearing.

Regarding Father's allegation that he was not duly served with Notice of the termination hearing, this Court disagrees. Pennsylvania law states "As in all civil cases, the petitioner ... bears the burden to prove proper service by its affirmative acts." In re K.B., 763 A.2d 436, 439 (Pa. Super. 2000). The Adoption Act contains specific notice requirements in termination proceedings. 23 Pa.C.S.A. § 2513[4] requires a court to fix a time for a hearing and requires notice of the termination hearing be given at least 10 days in advance, by personal service or by registered mail, to the parent's last known address, or by such other means as the court may require. The subsection also provides specific language the notice must contain. And the Pennsylvania Orphans' Court Rules governing termination proceedings provide further mandates about notice,

---

[4] **23 Pa.C.S.A. § 2513. Hearing. (a) Time.**--The court shall fix a time for hearing on a petition filed under section 2512 (relating to petition for involuntary termination) which shall be not less than ten days after filing of the petition. **(b) Notice.**--At least ten days' notice shall be given to the parent or parents, putative father, or parent of a minor parent whose rights are to be terminated, by personal service or by registered mail to his or their last known address or by such other means as the court may require. A copy of the notice shall be given in the same manner to the other parent, putative father or parent or guardian of a minor parent whose rights are to be terminated. A putative father shall include one who has filed a claim of paternity as provided in section 5103 (relating to acknowledgment and claim of paternity) prior to the institution of proceedings.

33

Pa.O.C.R. 15.4(d)[5] and 15.6[6] requiring notice be sent "by registered or certified mail to his or her last known address."

This Court finds DHS had properly given Father notice of the hearings and properly served him with documents. The evidence shows two deliveries were made to Father's residence: one on January 4, 2021 by UPS Next Day Delivery at 3:55 p.m. and another on January 7, 2021 by USPS at 10:45 a.m., both at 7279 Saybrook Ave., Philadelphia, PA 19142. (Exhibit-DHS-2).

## CONCLUSION

At the Hearing on 5/08/2019, this Court reasoned and noted:

> There are a number of things that are very troubling to the Court, and not the least of which is the lack of any credibility by Mother and Father; credibility throughout the history of this care; the attempts at deception; the attempts at concealment. Were it not for the diligence of DHS, we would have never been made privy to the fact that both Mother and Father, R.M., have this criminal history which they denied. And Dr. Russell would never have made the mistake of confusing criminal history with child abuse. I've had the doctor in front of me numerous times. That mistake is not believable. That presents another issue to

---

[5] **231 Pa.Code Rule 15.4. Involuntary termination of parental rights.** (d) **Notice and hearing.** Notice of the hearing on the petition shall be given, in accordance with Rule 15.6 hereof, to the parent or parents whose rights are sought to be terminated, including the parent of a child born out of wedlock, to any intermediary named in a Report on Intention to Adopt, if one has been filed, and to the guardian of the person or guardian ad litem of any parent or parents who is or are under the age of 18 years. Each petitioner, each person whose joinder or consent is attached to the petition and any intermediary named in a Report of Intention to Adopt shall be examined under oath at the hearing unless they are excused by the court.

[6] **231 Pa.Code Rule 15.6.** Notice to persons; method; notice of Orphans' Court proceedings filed on dependency docket. (a) Notice to every person to be notified shall be by personal service, service at his or her residence on an adult member of the household, or by registered or certified mail to his or her last known address. If such service is unobtainable and the registered mail is returned undeliverable, then: (1) no further notice shall be required in proceedings under Rules 15.2 or 15.3, and (2) in proceedings under Rules 15.4 and 15.5, further notice by publication or otherwise shall be given if required by general rule or special order of the local Orphans' Court. If, after reasonable investigation, the identity of a person to be notified is unknown, notice to him or her shall not be required.

the Court. And that is, given the parents' level of deception and dishonesty....strike this Court as so hostile to the issue of truthfulness, and the complete lack of transparency and honesty by the parties. Having had them before me on numerous occasions—in fact, I've had this case from the beginning—I am concerned now about their ability to be honest and forthright. And that complete lack of honesty presents a safety issue to the Court. (N.T., 5/08/2019, p.95 at 11-25, p.96 at 1-14).

The Court Record shows that S.M.'s sibling, J.L.B., was the victim of repeated physical and emotional abuse while in Mother and Stepfather, R.M.'s care. Both Mother and R.M. were found by this Court to be the perpetrators of child abuse on March 14, 2018. This Child, S.M., was adjudicated dependent on June 27, 2018, and has been in foster care since November 16, 2017, four days after her birth.

The evidence presented to this Court was clear and convincing that Father is incapable of providing the protection necessary to keep this Child safe, and that he is incapable of parenting. Safety and loving care is essential to the growth and well-being of any child, and this Court cannot place this Child in an environment where her well-being and safety may be at risk. This Child's life cannot be placed on hold in the hope that Father will summon the ability to handle the responsibilities of parenting. Further, this Child and her older sibling have been placed together in a loving, caring, nurturing home with the pre-adoptive foster family, and this Court believes they deserve the opportunity to experience a loving, caring home where they are protected from harm.

Thus, this Court finds by clear and convincing evidence that DHS has met its burden to involuntarily terminate Father's parental rights. This Child's life can now be moved towards adoption. For the foregoing reasons, this Court respectfully requests that

35

the Decree of Involuntary Termination of Parental Rights of Father, R.M. and the Goal

Change to Adoption Order issued by this Court on July 21, 2021, be **AFFIRMED**.

BY THE COURT:

_____
**ALLAN L. TERESHKO, Sr. J.**

_Oct 7ᵗʰ 2021_
**DATE**

36